Gianna Borroto (IL Bar No. 6305516; DC Bar No. 90023071)*
Patrick Taurel (DC Bar No. 741700)*
Grossman Young & Hammond, LLC
4922 Fairmont Avenue, Suite 200
Bethesda, MD 20814
Telephone: (240) 403-0913
gborroto@grossmanyoung.com
ptaurel@grossmanyoung.com

Meredyth Yoon (GA Bar No. 204566)
Samantha C. Hamilton (GA Bar No. 326618)
Asian Americans Advancing Justice – Atlanta
5680 Oakbrook Pkwy, Suite 148
Norcross, GA 30093
Telephone: (470) 816-3319
myoon@advancingjustice-atlanta.org
shamilton@advancingjustice-atlanta.org

*Pro hac vice applications forthcoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

| | |
|---|---|
| M.M.B.B., on her own behalf and on behalf of her minor child, N.B.,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>United States of America,<br><br>　　Defendant. | Case No. _____<br>**COMPLAINT** |

**INTRODUCTION**

1. On or about July 1, 2021, M.M.B.B. ("Plaintiff Mother"), then 19-years-old, arrived at the U.S.-Mexico border 36-weeks pregnant with the unborn child of her rapist. Fearful of what would happen to her in the dangerous borderlands of Mexico, as well as her native Honduras, Plaintiff Mother sought the protections afforded to her by law in the United States. She did not receive them. Instead, agents of U.S. Border Patrol subjected Plaintiff Mother, and later her newborn U.S. citizen son ("Infant Plaintiff"), to a series of wrongful acts that visited great harm on them, including unlawful detention, deprivation of medical care, food, and water, and not one but two unlawful expulsions, the second of which left Plaintiff Mother, still reeling from childbirth, and two-day-old Infant Plaintiff hysterically crying on the international bridge linking Eagle Pass, Texas and Piedras Negras, Mexico, with nothing but the clothes on their backs and an extra baby shirt given to Plaintiff Mother by staff at the Texas hospital where she had just given birth.

2. U.S. Border Patrol agents carried out the expulsions under the purported authority of an interim final rule issued by the Centers for Disease Control and Prevention (CDC) under 42 U.S.C. § 265. However, the expulsions of Plaintiffs directly violated the rule and implementing guidance, which prohibited its application to U.S. citizens like Infant Plaintiff and to

noncitizens who fear persecution or torture in the country of expulsion, like Plaintiff Mother. In addition, the stated justification for the expulsion authority—prevention of the introduction of COVID-19 into the United States—was not at issue, as Plaintiff Mother had tested negative for COVID-19 while in the hospital prior to her post-childbirth expulsion.

3. Plaintiffs bring this suit under the Federal Tort Claims Act (FTCA), 28 U.S.C § 1346(b), to seek compensation for the harm and losses they suffered as the result of the tortious conduct committed by U.S Border Patrol agents.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1346(b).

5. On March 13, 2023, Plaintiffs submitted timely administrative claims under the FTCA to the U.S. Department of Homeland Security (DHS) and its component agency U.S. Customs and Border Protection (CBP), of which U.S. Border Patrol is a sub-component agency. CBP denied the Plaintiffs' administrative claims on June 23, 2023. Plaintiffs filed a request for reconsideration on December 19, 2023, which CBP denied on May 1, 2024. Plaintiffs are timely filing this Complaint in accord with the FTCA. 28 U.S.C. §§ 2401(b), 2675(a).

6. Venue is proper in this division of this District under 28 U.S.C. § 1402(a), as

Plaintiffs reside in this division of this District.

## PARTIES

7. Plaintiff Mother,[1] a Honduran national, is currently 22 years old and was 19 years old when U.S. Border Patrol agents twice expelled her to Mexico. She is the mother of Infant Plaintiff N.B. She resides in Tucker, Georgia.

8. Infant Plaintiff N.B., a U.S. citizen, is currently three years old and was a two-day old newborn at the time U.S. Border Patrol agents expelled him to Mexico. He resides with his mother in Tucker, Georgia.

9. Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671 et seq.

10. All federal officers referenced in this Complaint were acting within the scope and course of their employment and were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## LEGAL BACKGROUND

*The Title 42 Expulsion Process*

11. In a public health emergency, Congress authorized the Executive Branch to "prohibit, in whole or in part, the introduction of persons and property" from countries which it designates. 42 U.S.C. § 265.

12. On March 24, 2020, in response to the pandemic caused by coronavirus

---

[1] A Motion to Proceed under Pseudonym accompanies the docketing of this Complaint.

disease 2019 (COVID-19), the U.S. Department of Health and Human

Services (HHS) issued an interim final rule under 42 U.S.C. § 265 permitting

the CDC to suspend the introduction of persons into the United States who

may "present a risk of transmission of a communicable disease."[2]

13. The Interim Rule purported to implement 42 U.S.C. § 265 and was adopted

as part of the agency's response to COVID-19. The Interim Rule purported

to allow the CDC to "prohibit the introduction . . . of persons from

designated foreign countries . . . for such period of time that the [CDC]

deems necessary for the public health."[3]

14. Two days later, on March 26, 2020, the CDC issued an order (Title 42

Order), pursuant to its new regulatory authority, providing the Department

of Homeland Security (DHS) with the authority to "suspend the

introduction" of noncitizens seeking to enter the United States at and

between land ports of entry (POEs).[4] The Title 42 Order, effective March 20,

2020, applied to noncitizens without proper travel documents, those whose

entry is otherwise contrary to law, and those who are apprehended near the

---

[2] Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,566 (Mar. 24, 2020) (to be codified at 42 C.F.R. § 71.40).
[3] 85 Fed. Reg. at 16,563 (discussing amendments to 42 C.F.R. § 71.40).
[4] Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020).

border seeking to unlawfully enter the United States. With certain exceptions, it permitted DHS officers to return such individuals to their countries of origin or the countries from which they entered the United States.[5]

15. Critically, the Title 42 Order did not apply to U.S. citizens, lawful permanent residents, members of the armed forces, spouses and children of all three of those groups, or noncitizens with valid travel documents.[6] It further exempted "persons whom customs officers of DHS determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer, and public safety, humanitarian, and public health interests."[7] This Title 42 Order was amended and extended three times in 2020 and each reissuance included the same exemptions.[8]

16. The primary stated rationales for the Title 42 Order and subsequent extensions were that the individuals subject to them were generally held for

---

[5] *Id*. at 17,067.
[6] *Id*.
[7] *Id*.
[8] *See* Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020); Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantine Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 16, 2020). Amendments after 2020 are not relevant to this claim.

extended periods in CBP facilities while being processed, that these facilities could not accommodate recommended social distancing, and that CBP was not equipped to handle COVID-19 testing of all detained individuals or segregation of those suspected of having the virus.[9]

17. On September 11, 2020, the CDC published a Final Rule.[10] The Final Rule differed from the Interim Rule in that it specifically authorized "physically expelling from the United States some or all of the persons" subject to the Final Rule.[11] The CDC Director subsequently issued the October 2020 amendment and extension to the Title 42 Order.[12]

18. A federal court subsequently ruled that the Title 42 Order was arbitrary and capricious under the Administrative Procedure Act for, inter alia, failing to sufficiently consider that noncitizens may face persecution or torture in the country of expulsion. *Huisha-Huisha v. Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *cert. and stay granted sub nom. Arizona v. Mayorkas*, 143 S. Ct. 478 (2022), *and vacated as moot*, No. 22-5325, 2023 WL 5921335 (D.C. Cir. Sept. 7, 2023); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 731-32 (D.C. Cir. 2022) (holding that plaintiffs were likely to succeed on claim

---

[9] 85 Fed. Reg. at 17,065-67.
[10] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020) (Final Rule).
[11] *Id.* at 56,445.
[12] 85 Fed. Reg. 65,806.

that government could not expel noncitizens under Title 42 to a country in which they would be persecuted or tortured).

19. Title 42 ended in May 2023, when the COVID-19 public health emergency expired.

*CBP's implementation of the Title 42 Order*

20. In a document, dated March 20, 2020, CBP stated that the Title 42 Order applied to all persons traveling from Canada or Mexico "who would otherwise be introduced into a congregate setting in a land [POE] or Border Patrol station," with certain exceptions. Ex. 1, CBP COVID-19 Response: Suspension of Entries and Imports, Concept of Operations, at 1.

21. Soon after, U.S. Border Patrol, a component of CBP, issued guidance to the field regarding implementation of the Title 42 Order. Entitled *COVID-19 CAPIO*, the guidance instructed CBP officers to apply the Title 42 Order to noncitizens seeking to enter the United States from Mexico or Canada at or between a POE who are without proper travel authorization or subject to travel restrictions.[13] The guidance further instructed that injured noncitizens could not be expelled under Title 42 but instead were to be processed in accord with existing immigration laws under Title 8 of the United States

---

[13] U.S. Customs & Border Prot., *COVID-19 CAPIO* at 1, https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/COVID%2019%20Capio.pdf (last visited Oct. 23, 2024).

Code.[14] Additionally, the guidance instructs that, where a noncitizen is subject to expulsion, the agent is not to take the person's property.[15]

22. Further, the guidance instructed that, where a noncitizen states a reasonably believable claim of torture in the country to which they are being expelled, the agent cannot expel them without first referring them to an asylum officer with U.S. Citizenship and Immigration Services (USCIS) for screening of their fear claim.[16]

23. Absent from the COVID-19 CAPIO guidance was any mention of exempting individuals from the Title 42 Order due to "consideration[s] of significant law enforcement, officer, and public safety, humanitarian, and public health interests"—the exemption specified in the Title 42 Order.

24. Subsequently, in a May 1, 2020 document, Border Patrol summarized its activities related to COVID-19. Relevant here, it stated that "communication and coordination with ERO are a daily function within [USBP's Specialty Programs and Planning division]," including regarding "pregnant females." Ex. 2, U.S. Border Patrol COVID-19 Response, at 2. It went on to state that the ICE contractor "will not take custody of any [redacted material] females;" that "[redacted material] pregnancy is a hard NO for any flight

---

[14] *Id*. at 3.
[15] *Id*. at 2.
[16] *Id*. at 4.

activity;" and, finally, that "USBP reserves [the Migrant Protection Protocols] as a reliable alternative for expelling [redacted material] pregnant females." *Id.*

***CBP Policies Regarding Pregnant and Postpartum Mothers and Babies***

25.CBP has a longstanding policy of ensuring that pregnant women and family units are treated as "at-risk" populations of special concern due to their particular vulnerability.[17] For example, on August 18, 2021, CBP issued agency guidance memorializing the expected treatment of pregnant and postpartum women under the Title 42 Order. The memorandum states that "the treatment of women who give birth in CBP custody raises significant humanitarian and public health interests" which warrant an agent's "serious consideration" of whether an exception to the Title 42 Order is warranted. Ex. 3, CBP Pregnancy and Childbirth Guidance, at 1. The memorandum further explained that: "Women who have given birth in CBP custody may require additional medical care such that expulsion of the mother may lead to negative health outcomes for the mother and/or her newborn child. Additionally, these women could be expelled at locations or into conditions that make it difficult to safely care for the newborn child and recover from

---

[17] U.S. Customs & Border Prot., *National Standards on Transport. Escort, Detention, and Search*, § 5.1 (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf [hereinafter TEDS Standards].

the delivery." *Id.*

26. The memo concludes by instructing agents that when assessing whether an exception to the Title 42 Order exists, they "should consider that the public health and humanitarian interests may weigh in favor of an exception . . . for mothers who have given birth while in CBP custody and require medical attention." *Id*. It further states that all determinations that mothers who gave birth in CBP custody and require medical attention *should* be subject to expulsion must be approved by a second line supervisor. *Id*.

27. On or about November 30, 2021, CBP issued additional guidance regarding the required treatment of pregnant, postpartum, and nursing individuals and infants. Ex. 4, CBP Policy Statement and Required Actions Regarding Pregnant, Postpartum, Nursing Individuals, and Infants in Custody. This guidance identifies these groups as "vulnerable populations" and highlights the "humanitarian or public health needs" which pregnant, postpartum, or nursing individuals may have and the "unique medical and other care in custody needs" of infants. *Id*. at 1. Among other things, the guidance reiterates existing guidance in requiring CBP personnel to provide "appropriate follow up care and final medical disposition" following return to CBP custody from a local health provider. *Id*. at 2-3.

28. On information and belief, U.S. Border Patrol has a long-standing policy

requiring its agents to provide information to noncitizen parents of U.S. citizen newborns about how to obtain U.S. birth certificates for their child. The policy was memorialized on May 24, 2022, when CBP issued a directive concerning children born to mothers who are in CBP custody.[18] This directive makes clear that: 1) Newborns and postpartum mothers in CBP custody are vulnerable populations; 2) Babies born while the mother is in CBP custody in the United States are U.S. citizens; 3) CBP officers are to make every effort to process newborns' parents and any minor children accompanying the parents in a manner that ensures family unity; 4) CBP officials are to provide Vital Records Information Tear Sheets to postpartum mothers to help them obtain birth certificates for the newborns at a later date; and 6) Upon discharge from a hospital to CBP custody, CBP officials are to follow all immediate discharge instructions while the mother remains in custody and must ensure that postpartum mothers receive an original copy of any medical records and discharge instructions in CBP's possession.

---

[18] U.S. Customs & Border Prot., *Children Born in the United States in CBP Custody or at a CBP Facility*, § 6.1.7.4 (May 24, 2022), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/2022_0524_children-born-in-cbp-custody-or-cbp-facilities-directive.pdf [hereinafter Children Born in CBP Custody].

## STATEMENT OF FACTS

***CBP's expulsion of Plaintiff Mother when she was eight months pregnant and complaining of significant pain***

29. On or about July 1, 2021, Plaintiff Mother, a 19-year-old Honduran woman, entered the United States from in or near Piedras Negras, Mexico with her mother, and her two minor sisters. Plaintiff Mother was fleeing persecution in Honduras and intended to seek asylum in the United States. She was then 8 months pregnant with her first child, as a result of a rape, and her pregnancy was high-risk.

30. After crossing the border, at approximately 9:00 p.m., Plaintiff Mother. and her family encountered a CBP agent. Plaintiff Mother and her mother told the agent that they wanted asylum in the United States. He laughed and told them to wait for other agents to arrive. Shortly thereafter, several other agents joined them and also started laughing when they learned that the family was from Honduras and seeking asylum. The agents placed all members of the family in a vehicle and drove to a CBP facility. Once there, they directed Plaintiff Mother alone to get out of the vehicle; her mother and sisters remained in the vehicle, which then departed. Plaintiff Mother had no idea where her family members were taken.

31. An agent took Plaintiff Mother inside a chain link fence that enclosed an area with large tents. She was taken to one of the tents and sat alone on a

bleacher. She remained there for several hours. Despite being visibly pregnant, the CBP agents did not give her anything to eat or drink during this time. They also did not fingerprint or photograph her. She asked the agents what had happened to her mother and sisters, but they said they had no information about her family.

32. While sitting on the bleacher, Plaintiff Mother began to experience pain in her legs, knees and back. Plaintiff Mother suffers from Acute Intermittent Porphyria, one of the symptoms of which is pain in the legs.[19] Acute Intermittent Porphyria increases pregnancy-related risks.[20] Plaintiff Mother told the agents that she had a high-risk pregnancy and was in pain and asked to see a doctor. The agents did not respond.

33. At approximately 1:00 a.m. on July 2, 2021, CBP agents placed Plaintiff Mother in a vehicle and drove her to the international bridge between Eagle Pass, United States, and Piedras Negras, Mexico. When she realized she was being expelled to Mexico, Plaintiff Mother became frantic and began crying, begging the agents not to send her to Mexico. She cried out to them that she was pregnant, in pain, and had no one to help her in Piedras Negras. Despite her desperate pleas, the agents left her on the international bridge. She had

---

[19] *See About Porphyria*, Am. Porphyria Found., https://porphyriafoundation.org/for-patients/about-porphyria/ (last visited Oct. 23, 2024).
[20] *See* Emily Malcolm, *Porphyria and Pregnancy*, Porphyria News (July 7, 2020), https://porphyrianews.com/health-insights/pregnancy-and-porphyria/.

no money and no cell phone.

34. Plaintiff Mother was extremely frightened. It was the middle of the night, and she was alone. She had no idea where her mother and sisters were and, without a cell phone, no way to even attempt to contact them. She was worried about her pregnancy and the health of her baby. Paralyzed by fear, Plaintiff Mother sat on the bridge for several hours because she did not know what else to do or where to go. As she sat there, she began to feel intense pain in her abdomen, which she later learned were contractions. The pain was so intense that she started vomiting. Seeing little alternative, and worried that she was in labor, she returned to the United States by crossing the Rio Grande.

***CBP's second expulsion of Plaintiff Mother and 2-day-old U.S. Citizen son***

35. On or about July 2, 2021, at approximately 4:00 or 5:00 a.m., Plaintiff Mother entered the United States at or near Eagle Pass, Texas. She was experiencing stronger contractions and had lost a shoe in the mud of the riverbank, making it difficult to walk. Within a few minutes, she located a law enforcement officer—possibly a Sheriff's deputy. The officer called CBP, and several CBP agents arrived. At first, the CBP agents did not believe that she was in labor. However, someone—either the non-CBP officer or a CBP agent—called an ambulance.

36. When the ambulance arrived, the medical personnel examined her. They determined that she was in labor and that her cervix was 4 centimeters dilated. The ambulance then brought her to Fort Duncan Medical Center. A CBP agent rode with Plaintiff Mother in the ambulance.

37. Plaintiff Mother arrived at the hospital at approximately 7:00 a.m. She was crying hysterically from intense labor pains. She was alone, without the support of her family, and felt terrified because she had never been in labor before.

38. Upon her admission, the hospital immediately performed a COVID-19 test, which hospital personnel told Plaintiff Mother was negative.

39. N.B. was born several hours later, at 11:19 a.m. on July 2, 2021. Because he was born in the United States, N.B. is a U.S. citizen.

40. Throughout her entire time in the hospital, two male CBP agents remained just outside Plaintiff Mother's hospital room with the door to the room open, including while she was giving birth. They rotated shifts. The agents did not allow her to make a phone call to her family. However, a doctor took a picture of N.B. after he was born and offered to send it to a relative or friend. At Plaintiff Mother's request, the doctor sent the picture to her mother's friend in Georgia.

41. The doctors expressed concern about Plaintiff Mother's medical condition

because she was very weak from chronic anemia. Hospital personnel administered iron through an intravenous line. They advised Plaintiff Mother not to breastfeed N.B. because of her weakness and the medication she was receiving. She understood that the doctors wanted her to remain in the hospital for at least several days to continue treatment for her anemia and regain strength.

42. On Sunday, July 4, 2021, CBP agents insisted that Plaintiff Mother and N.B. be discharged from the hospital despite Plaintiff Mother's condition. At the time, in addition to her chronic anemia, Plaintiff was experiencing vaginal pain and soreness, bleeding, constipation, pain urinating, pain throughout her body, including in her lower back and legs, and other physical pain and discomfort commonly attendant to childbirth. Simply moving about from place to place was painful for her. Plaintiff Mother protested CBP's actions to discharge her from the hospital, saying that she needed to obtain N.B.'s birth certificate and that the hospital had told her that this could not be done until Tuesday, July 6, because of the July 4th holiday. She also explained that hospital staff had recommended she remain in care for several days due to her anemia. The agents disregarded her.

43. Prior to her discharge, hospital personnel gave Plaintiff Mother some diapers, formula, and clothing for N.B., as well as postpartum care supplies

and clean clothes and shoes for herself.

44. The agents then took Plaintiff Mother and N.B. to a different CBP facility from the one she was held in on July 1. En route to the facility, Plaintiff Mother asked the agents if she could make a phone call. An agent responded that she was not entitled to a phone call.

45. Once at the CBP facility, an agent took the hospital bag of items from her and had her sit in an area that looked like a lobby. Plaintiff Mother sat in that area for several hours with Infant Plaintiff. It was very cold. Plaintiff Mother was experiencing vaginal pain and bleeding. She needed to change her postpartum pad, but the agent had taken her bag of supplies from the hospital, which included additional pads. During this time, CBP agents did not provide Plaintiff Mother with anything to eat or drink or with formula for Infant Plaintiff. None of the agents explained to her what would happen next.

46. Plaintiff Mother asked one of the agents how she could obtain a birth certificate for Infant Plaintiff. The agent responded that she could get the birth certificate through her consulate and gave her a piece of paper with a phone number. However, when she later called that number, a recorded message indicated that the number was not working.

47. In mid-to-late afternoon, agents took Plaintiff Mother and N.B. outside to a

vehicle. As they were leaving the building, an agent handed Plaintiff Mother an apple and a bottle of water. Plaintiff Mother then asked for the bag of supplies from the hospital. The agent told her that another agent had lost it. All Plaintiff Mother had for Infant Plaintiff was the clothing on his back and a thin shirt the hospital had given her.

48. The same CBP agent who had encountered Plaintiff Mother and her mother and sisters on July 1 drove her and Infant Plaintiff to the bridge between Eagle Pass and Piedras Negras. Plaintiff Mother asked him what had happened to her mother and sisters, but he told her that he did not know. When she realized he was expelling her to Mexico, Plaintiff Mother began crying and begged him not to leave her there with her newborn son. Plaintiff Mother told the agent that she was afraid to be returned to either Honduras or Mexico and wanted to apply for asylum in the United States. She asked him how she could apply for asylum if she was being sent back to Mexico. He just told her to keep on walking. He left Plaintiff Mother and Infant Plaintiff on the bridge with nothing but the clothes that they were wearing and the thin shirt for N.B. Plaintiff Mother was overwhelmed and very frightened. She had no idea how she would care for or feed Infant Plaintiff, since the doctors had advised her not to breastfeed due to her anemia. She was in substantial physical pain still from her recent childbirth and now did

not have access to pain relief medication, shelter, restroom facilities, and other basic necessities. She began crying hysterically.

49. Several people stopped to assist Plaintiff Mother. Someone in a passing car gave her a stroller and others gave her a little money. A woman on the bridge approached Plaintiff Mother and asked her what had happened. She gave Plaintiff Mother money and water. She said she was from Piedras Negras and would help. She offered to take Plaintiff Mother and Infant Plaintiff to her home, or if Plaintiff Mother would feel safer, to the police station. Plaintiff Mother agreed to go to her house, as she had nowhere else to go.

50. The woman assisted Plaintiff Mother in looking for her mother and sisters. They called several local shelters, without success. Plaintiff Mother also reached out to her mother's friend in Georgia, who in turn reached out to a journalist with Telemundo. Plaintiff Mother spoke with the journalist about what she and Infant Plaintiff had experienced.

51. Soon after this, an attorney named Taylor Levy contacted Plaintiff Mother. Ms. Levy made a parole request on behalf of Plaintiff Mother, which was granted. Plaintiff Mother was paroled into the United States, and N.B. admitted, on July 8, 2021.

52. Plaintiff Mother and Infant Plaintiff were expelled from the United States for

4 days.

53. Plaintiff Mother is currently pursuing an asylum claim in the United States.

## COUNT I
## FALSE IMPRISONMENT
### (Infant Plaintiff)

54. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

55. Infant Plaintiff is a U.S. citizen by birth in the United States.

56. The Border Patrol agents referenced above unlawfully and intentionally confined Infant Plaintiff following his birth and/or discharge from the hospital and continuing through his physical expulsion from the United States to Mexico and his period of expulsion in Mexico.

57. The unlawful and intentional confinement and physical expulsion from the United States of Infant Plaintiff was carried out against the will of his mother.

58. As a U.S. citizen, Border Patrol agents lacked lawful authority to physically expel Infant Plaintiff from the United States without his mother's consent.

59. During the time Infant Plaintiff spent in Mexico after his expulsion, he was confined to Mexico.

60. As a direct and proximate result of the above conduct, Infant Plaintiff suffered substantial damages.

61. Under the Federal Tort Claims Act, the United States is liable to Infant

Plaintiff for false imprisonment

## COUNT II
## FALSE IMPRISONMENT
### (Plaintiff Mother)

62. Plaintiffs repeat and reallege all the foregoing allegations as though fully set

forth herein.

63. The Border Patrol agents referenced above unlawfully and without her

consent deprived Plaintiff Mother of her liberty by twice physically expelling

her from the United States to Mexico, given that in both instances of

expulsion she was medically compromised, had a fear of physical injury,

torture, or death if expelled to Mexico, and had tested negative for COVID-

19.

64. The deprivation of Plaintiff Mother's liberty lasted a combined total of 4 days.

65. During the time Plaintiff Mother spent in Mexico after her expulsions, she

was confined to Mexico.

66. As a direct and proximate result of the above conduct, Plaintiff Mother

suffered substantial damages.

67. Under the Federal Tort Claims Act, the United States is liable to Plaintiff

Mother for false imprisonment.

**COUNT III**
**NEGLIGENCE**
**Expulsion Without First Seeking USCIS Review of Fear Claims**
**(Plaintiff Mother)**

68. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

69. Border Patrol agents were prohibited from expelling to Mexico under Title 42 any noncitizen who expressed a fear of persecution or torture in Mexico without first referring the noncitizen to USCIS for a fear screening. Thus, Border Patrol agents had a duty to make a referral to USCIS when a noncitizen raised a fear claim.

70. Plaintiff Mother had a fear of persecution or torture if expelled to Mexico. Plaintiff Mother expressed her fear to Border Patrol agents. The Border Patrol agents referenced above knew or should have known that Plaintiff Mother had a fear of persecution or torture in Mexico.

71. Border Patrol agents twice expelled Plaintiff Mother to Mexico without first referring her to USCIS for a fear screening.

72. Border Patrol agents breached their duty to Plaintiff Mother by failing to ensure that USCIS carried out a fear screening prior to expelling her to Mexico.

73. As a direct and proximate result of the above conduct, Plaintiff Mother

suffered substantial damages, including physical and emotional pain and suffering.

74. Under the Federal Tort Claims Act, the United States is liable to Plaintiff Mother for negligence.

**COUNT IV**
**NEGLIGENCE**
**Expulsion to Locations or Into Conditions Which Placed Plaintiffs' Health and Safety at Risk**
**(Both Plaintiffs)**

75. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

76. The Border Patrol agents referenced above had a duty of care to Plaintiffs, including but not limited to, acting with reasonable and ordinary care, so as not to cause harm or injury to Plaintiffs. This duty included a duty not to lose or misplace Plaintiffs' belongings as well as a duty to return prior to expulsion vital necessities for Infant Plaintiff.

77. By engaging in the acts alleged herein, the Border Patrol agents referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

78. The Border Patrol agents were aware that Plaintiffs were particularly vulnerable given their at-risk status. The Border Patrol agents knew or should have known the grave health and safety danger facing Plaintiffs as a

pregnant and later postpartum mother and newborn U.S. citizen upon

expulsion to Mexico only days after delivery, without basic necessities, like

formula for Infant Plaintiff, and food, water, and postpartum care supplies

for Plaintiff Mother, without a means of communicating with someone who

could help her, and without any support. In expelling Plaintiffs to Mexico in

these circumstances, the Border Patrol agents breached their duty of care.

79. As a direct and proximate result of the referenced conduct, Plaintiffs suffered

substantial damages, including physical and emotional pain and suffering.

80. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs

for negligence.

**Count V**
**NEGLIGENCE:**
**Failure to Secure Proper Medical Treatment for Plaintiff Mother**
**While in Border Patrol Custody**
**(Plaintiff Mother)**

81. Plaintiffs repeat and reallege all the foregoing allegations as though fully set

forth herein.

82. The Border Patrol agents referenced above had a duty to Plaintiffs, including

but not limited to, to act with ordinary care and prudence so as not to cause

harm or injury to the Plaintiffs.

83. By engaging in the acts alleged herein, the Border Patrol agents referenced

above failed to act with ordinary care and breached their duty of care owed

to Plaintiff Mother.

84. Border Patrol agents breached this duty by ignoring Plaintiff Mother's reports of feeling significant pain and her requests for medical attention, when she was eight months pregnant and her pregnancy was high-risk.

85. As a direct and proximate result of the referenced conduct, Plaintiff Mother suffered substantial damages.

86. Under the Federal Tort Claims Act, the United States is liable to Plaintiff Mother for negligence.

**COUNT VI**
**NEGLIGENCE:**
**Failure to Provide Information Regarding Obtaining a U.S. Birth Certificate**
**(Both Plaintiffs)**

87. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

88. The Border Patrol agents referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause them harm or injury.

89. Border Patrol agents had a duty to provide Plaintiff Mother, on her own behalf and on behalf of Infant Plaintiff, with information regarding how to obtain a U.S. birth certificate for her newborn child.

90. The Border Patrol agents referenced above breached this duty when they failed to provide Plaintiff Mother with accurate information on how she

could obtain a U.S. birth certificate for Infant Plaintiff. Instead, agents

provided Plaintiff Mother with a phone number that was out of service.

91. As a direct and proximate result of the referenced conduct, Plaintiffs

suffered substantial damages.

92. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs

for negligence.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Both Plaintiffs)

93. Plaintiffs repeat and reallege all the foregoing allegations as though fully set

forth herein.

94. By engaging in the acts described in the Complaint, the Border Patrol agents

referenced above engaged in extreme and outrageous conduct with an intent

to cause, or a reckless disregard of the probability of causing, Plaintiffs to

suffer severe emotional distress.

95. As a direct and proximate result of the conduct, Plaintiffs suffered severe

emotional distress.

96. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs

for intentional infliction of emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

a. Trial by judge;

b. Entry of judgment for Plaintiffs and against Defendant on Plaintiffs' claims for relief;

c. Compensatory damages in an amount to be proven at trial;

d. Costs and reasonable attorneys' fees; and

e. Such other relief as the Court deems just and appropriate.

Respectfully submitted,

_____*//s// Samantha C. Hamilton*_____          Date: November 1, 2024
Meredyth Yoon (GA Bar No. 204566)
Samantha C. Hamilton (GA Bar No. 326618)
Asian Americans Advancing Justice – Atlanta
5680 Oakbrook Pkwy, Suite 148
Norcross, GA 30093
Telephone: (470) 816-3319
myoon@advancingjustice-atlanta.org
shamilton@advancingjustice-atlanta.org

Gianna Borroto (IL Bar No. 6305516; DC Bar No. 90023071)*
Patrick Taurel (DC Bar No. 741700)*
Grossman Young & Hammond, LLC
4922 Fairmont Avenue, Suite 200
Bethesda, MD 20814
Telephone: (240) 403-0913
gborroto@grossmanyoung.com
ptaurel@grossmanyoung.com

*Pro hac vice applications forthcoming*

*Attorneys for Plaintiffs*